ILLINOIS CENTRAL RAILROAD COMPANY *v.* WINIFRED G. HARPER.

1. RAILROADS. *Two routes. Passengers. Wrongful ejection. Evidence. Directions of ticket agent. Assurances of preceding conductor. Explanation of passenger. Rules of company. Exemplary damages.*

If a railroad company, having two routes between the point where it receives a passenger and the place of her destination, sells her a ticket without designation thereon of the route upon which it is good:

(*a*) It will be bound by the direction of its ticket agent to the purchaser as to the proper train for her to take, and liable to the passenger for an ejection from such train after she has begun her journey; and

(*b*) The direction of the ticket agent and the statements of a preceding conductor of the company, over whose run the passenger had been carried before her ejection, to the effect that she was on the right train, are competent evidence for the passenger; and

(*c*) If the succeeding conductor, after hearing the statements of a woman passenger, detailing the directions she had received from the ticket agent and the declarations of the preceding conductor, refuse to honor her ticket and put her off, unattended in the night time, although he acted politely in so doing, it will be a willful wrong and subject his company to exemplary damages; and

(d) A passenger is not bound by a rule of the company, of which she did not have knowledge, requiring passengers to travel by the more direct route.

2. SAME.    *Passenger in wrong car.   Duty of conductor.*

Where a woman passenger, by the direction of the ticket agent, took the wrong car of a train, the conductor is not, upon correcting the mistake, under a duty to escort her to the right car, the train being vestibuled and she not so ill as to require assistance.

3. SAME.    *Pleadings.   Counts in declaration.*

A judgment for exemplary damages in an action of tort, clearly based upon a count of plaintiff's declaration which is insufficient to support any judgment will be reversed, although the declaration contains another count upon which, had it demanded such damages, the court would have maintained a larger verdict and judgment than the one rendered.

FROM the circuit court of, second district, Yalobusha county. HON. SAMUEL C. COOK, Judge.

Mrs. Harper, appellee, was plaintiff, and the railroad company, appellant, in the court below. From a judgment in plaintiff's favor, defendant appealed to the supreme court. The opinion states the facts.

*Mayes & Longstreet* and *J. M. Dickinson,* for appellant.

The evidence disclosed that the railroad company had a rule and regulation that passengers for local stations between Fulton and Grenada should go by the direct and shorter route.

The question is a novel one, but we invite attention of the court to the following authorities which support the reasonableness of the regulation of the company:

"It is a reasonable regulation for a railroad company operating a direct and a circuitous route between two points to require through passengers to go by the more direct route." *Church* v. *Chicago, M. & S. P. R. R. Co.,* 6 S. Dak., 235, 60 N. W., 854, 26 L. R. A., 616.

"Where a carrier operates a direct and a circuitous route between two points, the failure of the carrier to notify a through

passenger that he must go by the more direct route does not entitle the passenger to ride on the circuitous route." *Ibid.*

"The right of the company to make such a regulation can hardly be doubted in view of its reason and justice," etc. *Deitrich* v. *Pa. R. R. Co.,* 10 Am. Rep., 711; *Chicago & Alton R. R.* v. *Randolph,* 5 Am. Rep., 60.

"When a passenger purchases a ticket, he only acquires the right to be carried according to the custom of the road. He does not acquire the right to insist that the company shall send him on a special train or out of the customary course of their road." *Bennett* v. *N. Y. Central & Hudson River R. R. Co.,* 35 Am. Rep.

Anything that the agent at Princeton might have said is not material, so far as it would give plaintiff a right to disregard a well known regulation of the company, the conductor on the train from Princeton to Fulton had no authority to make any statement or representation to a passenger which would bind the company if the representation was to influence action as to some matter beyond the limit of his own run. *Railroad Co.* v. *Harris,* 81 Miss., 214.

If the agent at Princeton was mistaken, and if the conductor of the train from Princeton to Fulton was mistaken, still the evidence in this case demonstrates, beyond question, that there was no willfulness or wantonness or reckless disregard of the rights of the passenger by any of these agents, that their faults, if any there were, were negative, and the rights of the passenger grew out of the lack of proper knowledge on the part of the employes and not from any positive acts of wrong or malice or willful disregard of her rights. And yet, on this phase of the record, the court instructed the jury that if they believed that these actions were willful and wanton, the jury might award punitive and exemplary damages. *K. C. M. & B. R. R. Co.* v. *Riley,* 68 Miss., 765; 81 Miss., 214; 67 Miss., 24; *Barker* v. *N. Y., etc., R. Co.,* 24 N. Y., 499; *Railroad Co.* v. *Statham,* 42 Miss., 606; *Gage* v. *Railroad Co.,* 75 Miss., 17; *Wilson* v. *Rail-*

*road Co.,* 68 Miss., 9; *McCullough* v. *Railroad Co.,* 33 S. W., 285; *Railway* v. *Hendricks,* 32 S. W. Rep., 42; *Nunn* v. *Georgia R.,* 71 Ga., 710; *Railroad Co.* v. *Kilgore,* 32 Pa St., 294; *Railroad Co.* v. *Statham,* 42 Miss., 607; *Railroad Co.* v. *Kendrick,* 40 Miss., 374; *Hutchinson* on Carriers, secs. 6, 14; *Thompson* on Carriers of Passengers, 226, 227; Woods, Master and Servant, secs. 263, 267, 268; *Tillery* v. *Bond,* 38 Fed. Rep.; *Railroad Co.* v. *Carper,* 112 Ind., 26; *Burkett* v. *Lanata,* 15 La. Ann., 330; *Mobile & Montgomery R. R. Co.* v. *Ashcraft,* 48 Ala., 33; *Louisville R. R.* v. *Minogue,* 90 Ky., 369; *Railroad Co.* v. *Scurr,* 59 Miss., 456; *Railroad Co.* v. *Purnell,* 69 Miss., 652; *Railroad Co.* v. *Higgins,* 64 Miss., 80.

*Brewer & Creekmore,* for appellee.

It is contended by counsel for appellant that where a railroad company sells a ticket between two given points and they have two routes between the points, one a longer route than the other, that the passenger must of necessity take the shorter route or otherwise the defendant may lawfully put him off of the train in the night time, and we respectfully submit that to establish the precedent that they might put off a lady passenger in the night time over her protest and against her will because the route on which she was traveling was a few miles longer than another route owned and controlled by the defendant between the same points, would be unreasonable, and especially would this be true where, as in this case, she took the route which she had been three times advised she could take by the defendant's employes in charge of its passenger business, one of them giving her such advice being the passenger depot agent from whom she purchased the ticket. In support of this view we cite the following authority: *Robinson* v. *So. Pac. R. Co.,* 28 L. R. A., 773, 780. *Church* v. *Chicago Railroad Co.,* 26 L. R. A., 616, relied upon by counsel for appellant, says that the passenger before taking the train should obtain the information as to which route to take

from the agent from whom she purchased the ticket and should act upon this information, and this our client did.

Argued orally by *Jas. C. Longstreet,* for appellant, and *Earle Brewer,* for appellee.

Whitfield, C. J., delivered the opinion of the court.

Mrs. Harper lived at Henderson, Ky.; had been living there about 18 months. Prior to that time she had lived at Water Valley, Miss. On the 24th of July, 1901, desiring to make a visit to Water Valley, she bought a ticket from Henderson, Ky., to Water Valley, Miss., from the ticket agent at Henderson. She had lived at Grenada, Miss., before she lived at Water Valley, and her husband and herself desired that she should go by way of Grenada, because she had acquaintances there. She says that she preferred that route, because she did not know where she would be delayed on the direct route by way of Jackson, Tenn., in the night time, and her husband and herself desired that she should go by way of Memphis, and stop over at Grenada. The agent told her that there was no difference in the price of tickets, and she took the Memphis route. The defendant company had two routes: One from Henderson, via Jackson, Tenn., to Water Valley, called the direct route; but the local train ran over this route. The other route was from Henderson, Ky., via Princeton, Ky., to Memphis, Tenn., and Grenada, Miss. Over this the fast train ran. When Mrs. Harper got to Princeton, Ky., she interviewed the ticket agent of the defendant company there, and he told her to take the Memphis train—positively told her not to take the other train. She accordingly took the Memphis train at Princeton. When the conductor of the train came around for tickets, she asked him if she was all right —if she could go by way of Memphis. He told her that certainly she could go that way, and honored her ticket, and carried her to Brighton, Tenn., within one-half hour's run of Memphis. She was much nearer Water Valley at Brighton, going via Memphis,

than she would have been returning from Brighton to Fulton, Ky., and thence going to Water Valley. But at Brighton another conductor refused to pass her any further on that ticket; saying that the ticket was for the other route, and not good on that route, and that she would have to get off. It was then about half past eight at night. Mrs. Harper fully explained to him all that had passed between her and the two ticket agents and the conductor. On this point she says: "I told him the man had sold me a ticket for that route, and all of the railroad officials had instructed me to go on that way, and that I could not see why I could not; that I would get to Water Valley at 6:30 in the morning, and the other way would put me at Water Valley the day after; and that I had bought the ticket for that route. He put me off against my will; just willfully put me off. Of course, he did not take me bodily and put me off, but he told me I had to do it, and, of course, I did it. I went back to Fulton and spent the night." She further testifies that he positively refused to accept any explanation from her. She got to Fulton on the back train about ten o'clock that night. She would have been in Memphis in another hour on the route she was on. She stayed in the hotel at Fulton until five o'clock the next morning. She knew no person at Brighton, Tenn., and stayed at the depot there about twenty minutes, until the train going to Fulton came along. This was an accommodation passenger train. At Fulton, Ky., the ticket agent, according to her testimony, which the jury believed, pointed out to her the train which he said was going to Water Valley, and also the very coach on the train which she should take to go to Water Valley. After the train had started, the conductor of this train which she was on told her she was on the wrong train, but that he would put her on the right train directly. She says that by this time she was almost desperate, that she was really sick from anxiety and worry, and that she notified the conductor that she was thus sick from anxiety and worry. She had really gotten on the car that went to Nashville, Tenn., from Martin, Tenn. The conductor failed to

keep his promise to put her in the right coach, and she was about
to be carried to Nashville, Tenn., from Martin; but she pulled
the bell rope and stopped that train, and got off at Martin, and
found herself about fifty yards from the train going to Water
Valley, but it was just pulling out, and thus she got left, so far
as that train was concerned. She went to a hotel so sick that she
could not go to the dinner table, and dinner was served in her
room. She stayed at Martin all day, sick, and had to go to bed.
She then took, at last, the right train, and reached her destina-
tion, after all this worry, vexation, and delay—quite enough to
make any woman traveling by herself thoroughly sick from anx-
iety and worry. She stated that the agent at Henderson told her
expressly to go by Memphis, because she would make better con-
nection that way, and that she went through Memphis, because
she passed through Memphis in the night. She says that she had
gone from Water Valley to Henderson by way of Memphis,
buying her ticket at Water Valley via Grenada; that she had
gone that way twice. She says that the conductor at Brighton
was not insolent, but he was positive, and compelled her to get
off. She further testifies that the circuitous route from Hen-
derson to Water Valley was nevertheless the quickest route, by
five hours, because over that route the fast train ran. She fur-
ther says that the conductor on the train from Princeton told
her that the Memphis route was the best route and that she re-
mained on the train on his advice until they got to Brighton—
nearly to Memphis. She says that both the conductor and the
ticket agent at Brighton told her to take that route. The proof
of actual damages in a small amount—some $17—was made.
The jury returned a verdict for the plaintiff for $817.

The chief contention on the part of the appellant is that it was
incompetent to admit the declarations of the two ticket agents
at Henderson and Princeton, and of the conductor on the train
from Princeton, Ky., to Brighton, Tenn. This contention is un-
sound. The ticket, on its face, contained no information as to
which route should be taken, nor did it advise appellee of the

rule of the company relied on here—that passengers on their trains must go by direct route. Mr. Justice Lamar, speaking for the United States Supreme Court, in *N. Y., L. E. & W. R. Co.* v. *Winter's Administrator,* 143 U. S., at pages 69, 70, 12 Sup. Ct., at page 359, 36 L. Ed., at pages 78, 79, says: "The grounds upon which it is insisted that the evidence referred to was inadmissible are that the ticket itself, and the rules and regulations of the road with respect to stop-over checks, constitute the contract between the passenger and the road, and the only evidence of such contract, and that no representations made by a ticket seller could be received to vary or change the terms of such contract. This contention cannot be sustained, and is opposed to the authorities upon the subject. While it may be admitted, as a general rule, that the contract between the passenger and the railroad company is made up of the ticket which he purchases, and the rules and regulations of the road, yet it does not follow that parol evidence of what was said between the passenger and the ticket agent from whom he purchased his ticket, at the time of such purchase, is inadmissible, as going to make up the contract of carriage, and forming a part of it. In the first place, passengers on railroad trains are not presumed to know the rules and regulations which are made for the guidance of conductors and other employes of railroad companies as to the internal affairs of the company, nor are they required to know them. *Hufford* v. *Grand Rapids & I. R. Co.,* 64 Mich., 631 [31 N. W., 544, 8 Am. St. Rep., 859]. In this case there is no evidence, as already stated, that notice or knowledge of the existence of the rules of the defendant company, or what they were, with respect to stop-over privileges, was brought home to the plaintiff at the time he purchased his ticket, or at any time thereafter. There was nothing on the face of the ticket to show that a stop-over check was required of the passenger as a condition precedent to his resuming his journey from Olean to Salamanaca after stopping off at the former place. It is shown by the evidence that Olean was a station at which stop-over privileges were

allowed. Under such circumstances, it was entirely proper for the passenger to make inquiries of the ticket agent, and to rely upon what the latter told him with respect to his stopping over at Olean. *Hufford* v. *Grand Rapids & J. R. Co., supra; Palmer* v. *Charlotte, C. & A. R. Co.,* 3 S. C., 580 [16 Am. Rep., 750]; *Burnham* v. *Grand Trunk R. Co.,* 63 Me., 299 [18 Am. Rep., 220]; *Murdock* v. *Boston & A. R. Co.,* 137 Mass., 293 [50 Am. Rep., 307]; *Arnold* v. *Pennsylvania R. Co.,* 115 Pa., 136 [8 Atl. 213, 2 Am. St. Rep., 542]."

This is decisive of two propositions: First, that these declarations were competent; and, second, that this appellee was not bound by this alleged rule, of which she had no knowledge. It will be noted that this holding of the United States Supreme Court is squarely to the effect that the appellee would not have been bound by the rule unless information of it had been communicated to her, in any event. It is not necessary, however, in this case, on its facts, to hold that the appellee should rely on this statement of the principle in its strictness, though we think the principle is just as stated by the United States Supreme Court. For here it is manifest that she did make inquiry of the ticket agent and of the conductor as to what route she should take, and the authorities cited by learned counsel for the appellant go no farther than to hold that, where there is a rule such as here involved, it is the duty of the intending passenger to find out what route he should take, by inquiry, and that it is not the duty of the railroad company to bring home notice of this rule to such intending passenger, otherwise than in answer to inquiry. In the case of *Church* v. *Chicago, etc., R. Co.* (S. D.), 26 L. R. A., 616—which, it should be noted, was decided without any counsel appearing for the appellee, the passenger—the court reviews several authorities upon this particular question, as to which the editor, in the footnote, says: "Very few precedents exist." One of these authorities, relied on by appellant (*Chicago & A. R. Co.* v. *Randolph,* 5 Am. Rep., 60), distinctly says: "The required information can always be had from the agent where the ticket is

purchased, and it is but reasonable to require passengers to obtain the information, and to act upon it." In *Cheney* v. *Boston, etc.; R. Co.* (Mass.), 45 Am. Dec., 190, speaking upon this point, the court says: "The plaintiff might have inquired and informed himself of that." This is precisely what this plaintiff did, and "the direful spring of the woes unnumbered" which this plaintiff suffered was precisely the misinformation given her by the ticket agent. If it were a sound legal proposition that the company is not bound unless the plaintiff informs himself of the rule, still that condition was fully complied with in this case. Before passing from the *Church Case, supra,* we desire to say that the only erroneous information given in that case was given by a mere gatekeeper at the Milwaukee depot, whose sole duty, as pointed out at page 619, 26 L. R. A., was "to assist passengers in getting on the right trains." As stated: "He did not give her any misinformation. He simply did not advise her of the changes to be made at a junction five hundred miles distant." Mrs. Harper was not dealing with a gatekeeper. She dealt with the ticket agent, who was authorized to give the very information she sought. Other authorities showing the competency of the declarations of the ticket agent and conductor, if any are needed, may be found in the learned note to *Robinson* v. *So. Pac. R. Co.*, 28 L. R. A., 775. It is also relied on and insisted by counsel for appellant that, as between the conductor and the passenger, it was not the duty of the conductor to listen to the explanation made by Mrs. Harper. *K. C., M. & B. R. Co.* v. *Riley*, 68 Miss., 765, 9 South., 443, 13 L. R. A., 38, 24 Am. St. Rep., 309, and *Railroad Co.* v. *Drummond,* 73 Miss., 813, 20 South., 7, are decisive of the unsoundness of this view. In the Drummond case the passenger simply protested: he did not make any explanation; and it was on this ground that the decision proceeded. It was not only the duty of the conductor to listen to this most reasonable explanation, but, having heard it, as he did, it was wrong—a willful wrong warranting the imposition of exemplary damages—to put this lady off the train under the circumstances. It is none the

less a willful wrong because he acted in a gentlemanly manner, and was guilty of no insolent conduct. She was subjected to the most grievous wrong, and she was intentionally subjected to it, after full disclosure of what had occurred between her and the ticket agent of the company. Plaintiff was clearly entitled to recover, under the first count in the declaration, not only the actual damages she sustained, but exemplary damages, and a verdict for a larger sum than here recovered would not have been disturbed by us. It is idle to argue that the conductor, flatly refusing to listen to the perfectly reasonable explanation made by this woman, and putting her off, under the circumstances detailed in the evidence, at night, was not guilty of such intentional and oppressive wrongdoing as to warrant the imposition of punitive damages. It may as well be understood, once for all, that this court proposes to stand by the doctrine announced in the Drummond and Riley cases, as the just and true doctrine. But the difficulty in this case is that the plaintiff only asked for actual damages under the first count, when she was entitled to punitive damages, and yet asked and obtained an instruction for punitive damages under the second count, under which it is clear that she was entitled to no damages at all. Under the well-settled decisions of this court, it was not the duty of the conductor to place Mrs. Harper in the right car, and the mistake of the ticket agent at Fulton was corrected by the proper information given by the conductor. Mrs. Harper had nothing to do except to get up from her seat and walk forward through the vestibule train to the Water Valley car. She was not sick to such a degree as to require the assistance of the conductor. It follows that the fifth and seventh instructions for the plaintiff, to the effect that she was entitled to exemplary damages, are erroneous. In this curious attitude of the case, reversal must necessarily follow, for we must indulge the presumption that the jury did their duty, and obeyed the instructions of the court, which did not allow them to find anything but actual damages under the first count, but which did allow them to find exemplary damages under the second count.

The verdict cannot, under the instructions, be referred to the first count, since the actual damages were only about $17. It is obvious that it must be referred to the second count, under which no recovery at all could have been allowed. What we have said indicates the proper disposition of the case on a second trial, it being only necessary to add that the modification of the second instruction given for the defendant was necessary to a correct statement of the law.

*Reversed and remanded.*